# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| Q.R. a minor, by and through his natural mother and next friend JANE DOE, | ) ) | |
| Plaintiff, | ) | |
| | ) | Case No. 25-CV-01095-HLT-BGS |
| | ) | |
| Pump Lab, SL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

For Plaintiff, the third time is not a charm.

The present case is one of four near-identical lawsuits filed in this Court, each brought by the same Plaintiff, which allege that the owners and operators of various adult entertainment websites should be held liable because a teenager went on a porn-watching spree over a period of two months in the fall of 2024.[1]

This Court has already dismissed two of the other actions for lack of personal jurisdiction.[2] Following those dismissals, Plaintiff amended its complaint here.  In an initial status conference with Magistrate Judge Severson, Plaintiff specifically noted that its then-forthcoming amended complaint was specifically designed to address the concerns raised by this Court's jurisdictional dismissals in the other two cases.

And, what Plaintiff's amended complaint demonstrates more than anything is that – even

---

[1] Specifically, the Complaint here alleges that QR visited Defendant's website, Superporn.com, 135 times in four weeks. According to Plaintiff's other complaints, QR also visited the jerkmate.com websites 7 times (see *Doe v. ICF Technology Inc. et al.*, D. Kan. Case No. 25-cv-01093-HLT-BGS, Doc. 1); the chaturbate.com website 30 times (see *Doe v. Multi Media LLC et al.*, D. Kan. Case No. 25-cv-01094-HLT-BGS, Doc. 1); and the hentaicity.com website 12 times (see *Doe v. Titan Websites, Inc.*, D. Kan. Case No. 25-cv-01096-HLT-BGS, Doc. 1).

[2] The third action was also dismissed, seemingly because an arbitration clause at issue in that action required the parties to proceed in arbitration.

with the roadmap provided by this Court – Plaintiff cannot allege facts that would permit an exercise of personal jurisdiction over Pump Lab, SL, a Spanish company that lacks the necessary minimum contacts with Kansas essential to satisfying the Due Process requirements of the United States Constitution.

## FACTUAL BACKGROUND

Pump Lab, SL is a company incorporated and headquartered in Spain. First Amended Complaint ("FAC"), ¶2. During the relevant times identified in the FAC, Techpump Solutions, SL owned and operated the superporn.com website (the "Website" or the "Superporn Website"). *Id. at ¶3*. Approximately one year after the events at issue in the Complaint, Techpump Solutions, SL underwent a corporate restructuring and, as a result, the entity that *currently* owns and operates the Superporn Website is Pump Lab, SL ("Pump Lab"), which is also a Spanish company headquartered in Spain. *Id.* at ¶3; *see also* **Exhibit 1**, Declaration of Borja Mera Urrestarazu ("Borja Decl.") at ¶¶1-3.

Pump Lab does not have any employees in Kansas, nor has it ever had any employees in Kansas. Borja Decl. at ¶4. Pump Lab does not own or lease any real estate in Kansas, nor has it ever owned or leased real estate in Kansas. *Id.* at ¶5. Pump Lab does not conduct business in Kansas, nor does it have a license to conduct business in Kansas. *Id.* at ¶6. Pump Lab does not pay taxes in Kansas. *Id.* at ¶7. Pump Lab does not have any computer servers located in Kansas. *Id.* at ¶8. Pump Lab has no employees who travel to Kansas for any business purposes and, as such, litigating in Kansas would be a considerable burden. *Id.* at ¶9. Any and all decisions concerning the operation of the Superporn Website – including the implementation of age verifications measures – are made exclusively in Spain and put into practice from Pump Lab's offices in Spain. *Id.* at ¶10.

2

The Superporn Website is not aimed or directed at Kansas. *Id.* at ¶11. Instead, the Website is accessible to any user *without charge or cost* anywhere in the world, where such content is legally permissible. *Id.* at ¶¶11-12. Pump Lab does not sell subscriptions to the Superporn Website, nor has it ever charged visitors to access its content. *Id.* at ¶13.

As might be expected with a universally accessible website, the percentage of visitors from Kansas is infinitesimally small. Indeed, during the relevant period of time, visitors from Kansas represented ***less than one-tenth of one percent*** of the Website's visitors, specifically **0.086%** of the total visitors to the Website. *Id.* at ¶14. Indeed, although it is not actually relevant to the Court's jurisdictional analysis, visitors from the entire *United States* represented less than 10% of the Superporn Website's total traffic. *Id.*

The Terms of Service for the Superporn Website make clear that Pump Lab is a Spanish company and that users of the Website agree to personal jurisdiction in Spain. *Id.* at ¶15.

Pump Lab does not utilize any Content Delivery Networks (CDNs) that utilize servers located in Kansas. *Id.* at ¶16. Although Plaintiff's complaint and supporting declaration allege that the Superporn Website utilizes the CDN services of Cloudflare, this is simply incorrect. *Id.* at ¶17. Instead, Pump Lab utilizes the services of a British Company, DataCamp Limited, which operates CDN77. *Id.* at ¶18. CDN77 does not have servers (also known as Points of Presence or "PoP") in Kansas or even particularly close to Kansas. *Id.* CDN77 claims to have "200 PoPs across 130 countries." *See* https://www.cdn77.com/network. Of those 200 PoPs, however, only 13 are even located in the United States.[3] Even if the allegation in the Complaint and declaration about Cloudflare had been true, however, it would not – in any way – suggest that Pump Lab was

---

[3] CDN77's servers in the United States are located in Seattle, San Jose, Los Angeles, Denver, Dallas, Houston, McCallum (TX), Chicago, Atlanta, Miami, Ashburn (VA), Boston, and New York. *Id.*

attempting to direct its content towards Kansas. The Complaint merely points to the fact Cloudflare has servers located in Kansas City, *Missouri*, which is one of the 330 cities in more than 125 different countries, where Cloudflare has servers. *See https://www.cloudflare.com/sv-se/network/.*

Pump Lab does not use geolocation to target, direct, or promote any particular content towards users from Kansas. Borja Decl. at ¶22. To the contrary, to the extent Pump Lab uses geolocation, it is as part of an active compliance and prevention measure designed to *block* content from reaching certain users in a location where such content might be banned or restricted. *Id*. More specifically, it is expressly used to prevent access by minors and to comply with applicable legal and regulatory frameworks in each jurisdiction. *Id.*

In response to this Court's earlier decisions (*Q.R. v. ICF Tech., Inc.,* D. Kan. 25-cv-01093, Doc. 51 and *Q.R. v. Titan Websites, Inc.,* D. Kan. 25-cv-01096, Doc. 44), Plaintiff amended his complaint, adding additional allegations and providing the Declaration of Bassem Banafa, which makes certain technical assertions about Pump Lab and the operation of the Superporn Website. And, while the allegations would not move Plaintiff over the jurisdictional line even if accurate, Mr. Banafa's assumptions and unsupported assertions are almost entirely incorrect and largely misleading.

It is worth noting, preliminarily, that Mr. Banafa's Declaration provides no information whatsoever about his qualifications to provide what is, in essence, expert witness testimony. This is not entirely surprising given that Mr. Banafa does not appear to *have* any expertise in computer engineering, internet infrastructure, or website programming and operation. Instead, Mr. Banafa appears to be a forensic accountant, albeit one who seems to have experience tracking financial transactions conducted online. *See* **Exhibit 2**, LinkedIn profile of Mr. Banafa. Whatever his

experience may be, however, his conclusions concerning the operation of the Superporn Website are incorrect and, ultimately, irrelevant to the Court's jurisdictional analysis.

First, Mr. Banafa talks about cookies that he claims were generated by virtue of his visiting the Superporn Website and clicking through to a video. Assuming that Mr. Banafa's list is accurate, the cookies he identifies are standard components required for the operation of any modern website. Borja Decl., ¶25. The specific cookies identified by Mr. Banafa are primarily used for site security (for example, protecting against malicious bots), language and navigation preferences, and session management. *Id.* There is nothing about those cookies that demonstrates user tracking, profiling, or data monetization. *Id.*

Next, Mr. Banafa talks about analytics platforms. And, while he does not actually discuss the specifics of Superporn Website's use of analytics, he certainly makes it sound like that's what he's doing. Instead, Mr. Banafa's Declaration discusses, generally, what analytics a company *could* collect using the various analytics platforms if they chose to do so. Banafa Declaration, ¶¶ 5-7.

Mr. Banafa also claims in his declaration that "User data was also being provided in real-time to at least two advertisers, Exoclick and Sexchatters, almost immediately." *Id.* at ¶8. Mr. Banafa does not state the basis for this claim but, in any event, the only information transmitted to the advertisers are the categories of the videos that the user has chosen to watch. Borja Decl., ¶27. The system does not identify the user or transmit personal data to the advertisers about the users. *Id.*

Mr. Banafa also makes unfounded and misleading statements about the Superporn website's use of Cloudflare for CDN purposes. Despite Mr. Banafa's stated suppositions, the Superporn Website does not use Cloudflare for content delivery network purposes. Borja Decl.,

¶28. With respect to images and videos, this is all handled by CDN77. *Id.* And. with respect to the site's backend operations and application logic (the core code that orchestrates how a software application works, handling the flow of data between the user interface and the underlying business rules), this is all handled by Pump Lab's own servers. *Id.*

Finally, Mr. Banafa suggests that CDN77 allows its customers to choose which locations they want to prioritize for content delivery services. Whether or not this is correct, Pump Lab does not use content delivery networks to prioritize content delivery to Kansas or any other specific location. Borja Decl., ¶29. Instead, Pump Lab uses CDN77's services to speed content delivery to all locations. *Id.*

The First Amended Complaint and Mr. Banafa's declaration also seem to suggest that Pump Lab somehow aims advertising at Kansas or derives some specific benefit from such advertising. Nothing could be further from the truth. The advertising that appears on the Superporn Website is the result of an agreement between Pump Lab and Exoclick, SL, a third-party advertising network. Exoclick is also a Spanish Company. Borja Decl., ¶31. Other than providing space on the Superporn Website for ads to appear, Pump Lab has no role in the selection or placement of the advertisements themselves. *Id.* at ¶32. When a user visits the website, Exoclick's servers automatically determine what (if any advertisement) will be displayed to the user. *Id.* This is much like Google's Adsense network that automatically displays advertisements to people who visit websites that have agreements with Google for the placement of such ads. *Id.*

Pump Lab does not select the advertising to be displayed; does not select which advertising is displayed in what geographic location; and does not even determine if any particular visitor will see advertising at all. *Id.* at ¶33. Exoclick – and not Pump Lab – is solely responsible for the

6

selection of advertisers, the design and implementation of any advertising campaigns, the decisions about geographic placement, and ad rotation and frequency. *Id.*

While it is true that Pump Lab receives advertising revenue from Exoclick, the revenue it receives is based on the country where the website visitor is located, not the state. *Id.* at ¶34. Exoclick's revenue reporting is done not by state, but by country, and Pump Lab does not receive separate revenue figures for specific states such as Kansas. *Id.* So, while it is likely that Pump Lab receives some small amount of revenue as a result of advertising that Exoclick displays to visitors from Kansas (again, less than one-tenth of one percent of the website's visitors are from Kansas), that amount is simply reported to Pump Lab as part of the revenues received from website visitors from the United States as a whole. *Id.* at ¶35.

## LEGAL ARGUMENT

### I.      Legal Framework

When a defendant moves to dismiss a complaint for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff "bears the burden of showing that jurisdiction over the defendant is appropriate." *Serv. Experts, LLC v. Otte*, 609 F. Supp. 3d 1183, 1187 (D. Kan. 2022).

Only plausible, well-pled facts are accepted as true, with conclusory allegations properly ignored. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995); *Smith v. Rest. Depot*, Case No. 24-3056, 2024 U.S. App. LEXIS 23798, *3 (10th Cir. Sept. 19, 2024). And, where the defendant challenges the plaintiff's jurisdictional allegations via affidavit or other proof, the plaintiff must support those jurisdictional allegations "by competent proof of the supporting facts." *Wenz*, 55 F.3d at 1508. In addition to the plausible nonconclusory facts alleged in the complaint, this Court may also properly consider sworn declarations submitted in support of the defendant's motion. *Smith,* 2024 U.S. App. LEXIS 23798, at *2-3; *XMission, L.C. v. PureHealth Rsch.*, 105 F.4th 1300, 1307 (10th Cir. 2024).

Typically, a plaintiff must demonstrate that jurisdiction is both "(1) legitimate under the state's long-arm statute, and (2) does not offend the Due Process Clause of the Fourteenth Amendment." *Serv. Experts*, 609 F. Supp. 3d at 1188 (citing *Klein v. Cornelius*, 786 F.3d 1310, 1317 (10th Cir. 2015)). Where, as here, the state's long-arm statute extends to the limits of the United States Constitution's Due Process Clause, however, the two inquiries merge into one. *See, e.g., Wingate v. Barkman Honey, LLC,* Case No. 5:19-cv-04074-HLT, 2020 U.S. Dist. LEXIS 10201, at *6 (D. Kan. Jan. 22, 2020) ("because the Kansas long-arm statute reaches as far as federal due process will allow, the issue is narrowed to whether assertion of personal jurisdiction over the defendant would violate due process.").

The "constitutional touchstone of the determination whether an exercise of personal jurisdiction comports with due process 'remains whether the defendant purposefully established "minimum contacts" in the forum State.'" *XMission,* 105 F.4th at 1307 (citations omitted). "As the Supreme Court has held, '[a] tribunal's authority depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Id.* at 1307-08.

Additionally, in cases such as the present one, the Court must take extra care before exercising jurisdiction over foreign defendants. As the Supreme Court, Tenth Circuit, and this Court have all cautioned, "Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 115 (1987)(citations omitted); *OMI Holdings v. Royal Ins. Co. of Can.,* 149 F.3d 1086, 1096 (10th Cir. 1998)("When the defendant is from another country, this concern is heightened and 'great care and reserve should be exercised' before personal jurisdiction is

8

exercised over the defendant"); *TH Agric. & Nutrition, LLC v. Ace European Group Ltd.,* 488 F.3d 1282, 1292 (10th Cir. 2007)("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders")(citation omitted); *Tomelleri v. Quick Draw, Inc.,* Case No. 14-2441-CM, 2017 U.S. Dist. LEXIS 26518, at *8 (D. Kan. Feb. 8, 2017)("When the defendant is from another country, the court must be particularly cognizant of whether the burden of appearing in a distant forum is onerous, and 'great care and reserve should be exercised' before personal jurisdiction is exercised over the defendant.").

Personal jurisdiction comes in one of two forms: "general (all-purpose) jurisdiction or specific (case-linked) jurisdiction." *Old Republic Ins. Co. v. Continental Motors, Inc.,* 877 F.3d 895, 903 (10th Cir. 2017). An exercise of general jurisdiction requires a finding that a defendant's "affiliations with the state are so 'continuous and systematic' as to render them essentially at home in the forum state." *Id.* at 904 (*quoting Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011)). Clearly, the complaint in this case does not attempt to allege that Pump Lab is subject to general jurisdiction in Kansas.

The Court, then, is left to consider only the question of specific jurisdiction. "Specific jurisdiction calls for a two-step inquiry: (a) whether the plaintiff has shown that the defendant has minimum contacts with the forum state; and, if so, (b) whether the defendant has presented a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Old Republic Ins. Co.*, 877 F.3d at 904 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

II.     This Court Lacks Jurisdiction Over Defendant, a Spanish Corporations, That Lacks The Requisite Minimum Contacts With Kansas.

9

The minimum contacts test requires the plaintiff to show that the defendant "'purposefully directed its activities at the residents of the forum state,' and [] that 'the plaintiff's injuries must arise out of [the] defendant's forum-related activities.'." *Id.* "That is, the contacts with the forum state must be such that the defendant 'should reasonably anticipate being haled into court there.'" *XMission, L.C. v. Fluent Ltd. Liab. Co.,* 955 F.3d 833, 839 (10th Cir. 2020)(citations omitted).

The United States Supreme Court has reaffirmed that the due process inquiry must focus "on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). As the *Walden* court explained:

> First, the relationship must arise out of contacts that the "defendant *himself*" creates with the forum State.... We have consistently rejected attempts to satisfy the defendant-focused "minimum contacts" inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State....
>
> Second, our "minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.

*Id.* at 284-85 (italics in original).

For a Court to exercise specific jurisdiction over a foreign defendant, two prongs must be met: (1) the defendant purposefully directed its activities at residents of the forum, and (2) the plaintiff's alleged injuries arise out of or relate to those activities. *XMission*, 105 F.4th at 1308.

The Tenth Circuit has a well-developed body of caselaw articulating how a court should analyze the question of purposeful direction in the context of the internet. One of the most relevant examinations of the issues presented by this case comes from *Shrader v. Biddinger*, where the Tenth Circuit began by noting that:

> A number of circuits have addressed personal jurisdiction in the internet context, considering whether, when, and how such peculiarly non-territorial activities as web site hosting, internet posting, and mass emailing can constitute or give rise to contacts properly support jurisdiction over the host, poster, or sender. The basic problem with

10

relating such activities directly to the general principles developed pre-internet is that, in a sense, the internet operates 'in' every state regardless of where the user is physically located, potentially rendering the territorial limits of personal jurisdiction meaningless.

633 F.3d 1235, 1240 (10th Cir. 2011). "To avoid this untenable result, it is necessary to adapt the analysis of personal jurisdiction to this unique circumstance by placing emphasis on the internet user or site *intentionally directing* his/her/its activity or operation at the forum state rather than just having the activity or operation accessible there." *Id* (italics in original).

The *Shrader* court held that, because "the maintenance of a web site does not in and of itself subject the owner or operator to personal jurisdiction, even for actions relating to the site, simply because it can be accessed by residents of the forum state," a plaintiff instead had to show "indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Id.* at 1241*; see also Hood v. Am. Auto Care, Ltd. Liab. Co.,* 21 F.4th 1216, 1225 (10th Cir. 2021)("Courts are reluctant to say that hosting a website constitutes purposeful direction to every jurisdiction on the globe. [] Thus, we 'ask whether the defendant intended its online content to create effects specifically in the forum state.'")(citations omitted); *Old Republic Ins. Co.*, 877 F.3d at 908 ("'maintenance of a web site does not in and of itself subject the owner or operator to personal jurisdiction, even for actions relating to the site, simply because it can be accessed by residents of the forum state.' [] Instead, we 'look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state.'") (citations omitted).

As the *Shrader* court noted, the test it was adopting (and which numerous other circuits had adopted) was derived from the Supreme Court's so-called *Calder* "effects" test, articulated in

11

*Calder v. Jones*, 465 U.S. 783 (1984). *Shrader*, 633 F.3d at 1239-41. As subsequent Tenth circuit cases have held:

> this test analyzes whether an out-of-state defendant's tortious conduct satisfies three elements: '(1) an intentional action; (2) expressly aimed at the forum state; and (3) … knowledge that the brunt of the injury would be felt in the forum state.' …As the proponent of jurisdiction, plaintiffs must demonstrate each element of the effects test to satisfy the purposeful direction standard; that is, plaintiffs' failure to establish even one of the elements will doom their showing of purposeful direction.

*Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 966-67 (10th Cir. 2022)(internal citations omitted).

It is not enough for a plaintiff to show that a defendant knew that its internet content would be seen within the jurisdiction as well as every other jurisdiction. *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 846-47 (10th Cir. 2020) (holding that defendant who sent emails to all states, including Utah, was not subject to personal jurisdiction in Utah: "purposeful direction cannot be satisfied if the [defendant] simply wants as many responses as possible but is indifferent to the physical location of the responder"); *Loudermill v. Schroer*, 2024 U.S. Dist. LEXIS 190795, at *6-7 (D. Kan. Oct. 21, 2024)("While Plaintiff may be able to reasonably plead an intentional action that caused injury in the forum state by Defendant, he cannot show that Defendant expressly aimed his social media posts at the state of Kansas.")

Finally, "it is axiomatic that 'jurisdiction must be based on the conduct of *the defendant* itself' and not on 'the unilateral activity of another party or a third person.' …The proper focus of the purposeful-direction inquiry is thus on PureHealth's conduct in Utah and not the conduct of the email recipients who reside in the state." *XMission*, 105 F.4th at 1311 (multiple citations omitted) (italics in original).

Against this backdrop, it is abundantly clear the court lacks personal jurisdiction over Pump Lab. Preliminarily, although the FAC avoids saying so directly, it is evident that Plaintiff's primary argument in favor of personal jurisdiction is the simple fact that Defendant operates a website that

12

is freely accessible everywhere in the world and QR accessed that site while he was in Kansas. As is discussed above, the Tenth Circuit has explicitly and repeatedly rejected this argument.[4]

Next, the FAC attempts to obfuscate the actual inquiry facing the Court by engaging in a bit of legal sleight-of-hand, pretending that Pump Lab's *alleged* contacts with the United States in general are a suitable replacement for meaningful minimum contacts with Kansas. They are not. So, for example, whereas paragraphs 17-29 of the FAC purport to support Plaintiff's jurisdictional claims, they do no such thing inasmuch as they discuss purported contacts with the United States as a whole, and not the state of Kansas specifically.

The FAC next attempts to ground personal jurisdiction on Plaintiff's allegation that Pump Lab uses Cloudflare, a U.S. based company, to provide Content Delivery Network ("CDN")

---

[4] Nearly every other federal court to consider the question has concluded similarly. *See, e.g., Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 141 (4th Cir. 2020)("the website does not target South Carolina residents for commercial transactions any more than it targets any other state. … In our view, the mere fact that the website is accessible in a given state does not mean that Marriott is targeting its activities at that state"); *be2 LLC v. Ivanov*, 642 F.3d 555, 558-59 (7th Cir. 2011) ("If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution"); *Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 454 (3 Cir. 2003) ("[T]he mere operation of a commercially interactive web site should not subject the operator to jurisdiction anywhere in the world. Rather, there must be evidence that the defendant 'purposefully availed' itself of conducting activity in the [jurisdiction]. . . ."); *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th Cir. 2002) ("If we were to conclude as a general principle that a person's act of placing information on the Internet subjects that person to personal jurisdiction in each State in which the information is accessed, then the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist."); *Fraserside IP L.L.C. v. Hammy Media, LTD*, No. C11-3025-MWB, 2012 U.S. Dist. LEXIS 5359, *24-25 (N.D. Iowa Jan. 17, 2012) ("Although I accept as true Fraserside's allegations that xHamster intentionally infringed Fraserside's registered copyrights and trademarks, these allegations, alone, fail to demonstrate that xHamster 'uniquely or expressly aimed' its tortious acts at Iowa.... Although xHamster's website is both commercial and interactive, …such a website 'is arguably no more directed at Iowa than at Uzbekistan'"); *Liberty Media Holdings, LLC v. Letyagin, et al.,* 2011 WL 13217328 at *4 (S.D. Fla. Dec. 14, 2011) ("maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there: those users must be directly targeted....").

services, designed to speed the delivery of content to users in Kansas (among other places). See, FAC, ¶¶30, 34-35. The first fatal problem with this unsupported contention is that it is wholly incorrect and contradicted by Pump Lab's sworn declaration. Pump Lab does not use Cloudflare to speed the delivery of content to Kansas (or anywhere else) nor does it use Cloudflare in connection with its infrastructure, which it hosts on its own servers. The allegation having been challenged by sworn declaration creates a duty for Plaintiff to "support jurisdictional allegations in a complaint by competent proof of the supporting facts." *Wenz*, 55 F.3d at 1508; *see also McGinness Energy Co. v. Indep. Tubular Corp.*, Case No. 25-1076-KHV, 2025 U.S. Dist. LEXIS 226612, at *3 (D. Kan. Nov. 18, 2025)("If defendant sufficiently challenges the jurisdictional allegations, however, plaintiff must support them with competent proof.")

Even if Plaintiff could somehow support his allegation, it is insufficient on its face to support a finding of personal jurisdiction in Kansas. The most that Plaintiff can allege is that one of Cloudflare's hundreds of "points of presence" is in Kansas City, ***Missouri***. Complaint, ¶31. From this, Plaintiff makes the completely unsupported leap that, simply by engaging Cloudflare – which has servers in 330 cities in more than 125 different countries, one of which happens to be ***near*** Kansas – to provide CDN services, a defendant is targeting Kansas residents. It is a nonsensical assertion.

Plaintiff's factual argument in connection with the CDN provider Pump Lab actually uses, CDN77, is weaker still. CDN77 is a Spanish Company that has servers in 200 locations around the globe. And, while it does have 13 servers within the United States, those servers are located in Seattle, San Jose, Los Angeles, Denver, Dallas, Houston, McCallum (TX), Chicago, Atlanta, Miami, Ashburn (VA), Boston, and New York. *See* https://www.cdn77.com/network. None are particularly close to Kansas and, indeed, the distribution of CDN77's servers is consistent with

Pump Lab's sworn statement that it uses CDN77's services to speed content delivery everywhere and not specifically to Kansas.

This Court has already addressed – and rejected – identical arguments. *Titan Websites*, D. Kan. Case No. 25-cv-01096, Doc. 44, at 7-8 ("merely intending that users accessing its content be able to do so from a wide geographic area is not the same as purposefully directing one's activities at a forum. As with the ability to limit access from a particular geographic area, Plaintiff's argument proves too much. Technical steps taken to make a universally accessible website easier for all users to access no matter where they are located is no more purposeful direction than the act of setting up the website in the first place. And just like the act of setting up a website, were the indiscriminate use of a CDN or other technologies to indiscriminately facilitate content delivery enough, 'then the defense of personal jurisdiction, in the sense that a State has geographically limited judicial power, would no longer exist'"); *ICF Technology*, D. Kan. Case No. 25-cv-01093, Doc. 51 at 9-10 ("Defendants' use of the CloudFront CDN also does little to move the needle, jurisdictionally speaking. …Defendants' intention that their users be able to access their sites from a wide geographic area is not - even coupled with the knowledge that revenue-generating traffic would be coming from Kansas - the same as purposefully directing their activities at Kansas. As with the ability to limit access from a particular geographic area, Plaintiff's argument proves too much. Defendants do not controvert that they use CloudFront to help them deliver content. Defendants also do not controvert that a CloudFront edge server is located close to the forum. But there is neither an allegation nor evidence that Defendants selected the locations of any of the edge servers CloudFront employs or otherwise customized those CDNs to direct traffic more efficiently to Kansas over other locations").

15

Plaintiff also attempts to establish personal jurisdiction over Pump Lab by alleging that the Superporn Website utilizes cookies (as does every modern website). *See, e.g.,* FAC, ¶¶42-46. Essentially, Plaintiff seems to allege that – because the cookies allowed Pump Lab to know that a tiny percentage of the Superporn Website's visitors were located in Kansas – this is sufficient to establish personal jurisdiction there. This argument has been rejected in the District of Kansas and other juridictions. *See, e.g., Wells v. Facebook Inc.,* 2019 U.S. Dist. LEXIS 217168, at *1 (D. Kan. Dec. 18, 2019)(allegation that "[d]efendants['] website uploaded internet cookies to plaintiff['s] social media profiles that led to tracking, threats, and public backlash" insufficient to support personal jurisdiction); *Harris v. SportBike Track Gear*, 2015 WL 5648710 at *5 (D.N.J. Sep. 24, 2015)(allegation that "the website uses 'cookies' that allow Planet-Knox to keep track of consumer's shopping cart contents, store delivery addresses, and other personal details" insufficient to support a finding of personal jurisdiction); *Murphy v. Humbolt Clothing Co.*, 2021 U.S. Dist. LEXIS 17072, at *15-16 (W.D. Pa. Jan. 29, 2021)(holding that court lacked personal jurisdiction despite allegation that "Defendant's online store tracks consumers, without any exclusion for Pennsylvania, using at least five cookies, including a cart cookie that remains on consumers' browsers for two weeks and stores information about the contents of their shopping carts").

More to the point, this argument is inconsistent with this Court's holdings in *Titan Websites* and *ICF Technology*, where the Court explained that, while knowledge of visitors from a particular jurisdiction is a prerequisite to a finding of personal jurisdiction, "this sort of knowledge isn't enough absent some *intentional* or *purposeful* act by Defendant." *ICF Technology*, D. Kan. Case No. 25-cv-01093, Doc. 51 at 7; *Titan Websites*, D. Kan. Case No. 25-cv-01096, Doc. 44, at 6.

Plaintiff has also seemingly failed to appreciate the Court's holdings in *Titan Websites* and *ICF Technology* insofar as the decisions in those cases address the use of third-party advertising networks to monetize web traffic. As is discussed in detail, above, Pump Lab has an agreement with Exoclick (also a Spanish company) whereby Pump Lab provides space on the Superporn Website for the placement of ads. Other than the provision of that space, however, Pump Lab has no role in the selection or placement of the advertisements themselves. Instead, when a user visits the Superporn Website, Exoclick's servers automatically determine what (if any advertisement) will be displayed to the user. Pump Lab does not select the advertising to be displayed; does not select which advertising is displayed in what geographic location; and does not even determine if any particular visitor will see advertising at all. Exoclick – and not Pump Lab – is solely responsible for the selection of advertisers, the design and implementation of any advertising campaigns, the decisions about geographic placement, and ad rotation and frequency.

While it is true that Pump Lab receives advertising revenue from Exoclick, the revenue it receives is based on the country where the website visitor is located, not the state. Exoclick's revenue reporting is done not by state, but by country, and Pump Lab does not receive separate revenue figures for specific states such as Kansas. So, while it is likely that Pump Lab receives some small amount of revenue as a result of advertising that Exoclick displays to visitors from Kansas (again, less than one-tenth of one percent of the website's visitors are from Kansas), that amount is simply reported to Pump Lab as part of the revenues received from website visitors from the United States as a whole.

On near-identical facts, this Court found that a Defendant's use of ad networks to monetize web traffic did not demonstrate that the Defendant had purposefully directed its activities at Kansas:

> First, this line of argument fails to demonstrate how Defendant's site is meaningfully different from any other indiscriminate, universally accessible website. Second, the 'contact' with Kansas created by the advertising is largely due to a third-party advertiser's activities and not Defendant's. Plaintiff alleges Defendant receives geographic data on its users and transmits that information to ad networks. Plaintiff alleges Defendant received payments from advertisers for the traffic Plaintiff and other Kansans generated on its website. Defendant acknowledges that it receives advertising revenue and does not dispute that some of this revenue necessarily came from users in Kansas. But it asserts that its revenue is determined on a country-by-country, rather than a state-by-state, basis and that the revenue attributable  Kansas-based users… was miniscule. Defendant also maintains that although it received revenue from content accessed through Kansas users, what and whether users saw certain advertisements was not a decision it made. It was one left to the advertising networks it had contracted with. It's this last point that is the salient one: Purposeful direction focuses on the contacts defendants themselves make with a given forum, not the contacts made by plaintiffs or third parties.

*Titan Websites*, D. Kan. Case No. 25-cv-01096, Doc. 44, at 8-9; *see also ICF Technology*, D. Kan. Case No. 25-cv-01093, Doc. 51 at 8 ("Defendants' use of ad networks and subscription sales to monetize its traffic as indicia that Defendants purposefully directed the activities out of which Plaintiff's claims arise at Kansas also falls short of the mark. Defendants' receipt of revenue attributable to Kansas does not imply that Defendants deliberately directed their website's content at Kansas.")

Finally – and somewhat perversely – Plaintiff's complaint suggests that any attempt to *comply* with Kansas' age verification statute subjects a defendant to personal jurisdiction in the state. FAC, ¶54. In other words, Plaintiff is claiming that foreign companies must ignore Kansas' age verification law in its entirety, lest they subject themselves to personal jurisdiction in the state. As is often said of ludicrous assertions, "to state the argument is to refute it." *See, e.g., Travelers Cas. Ins. Co. of Am. v. A-Quality Auto Sales, Inc.,* 98 F.4th 1307, 1314 n.3 (10th Cir. 2024).

18

In short, Plaintiff's FAC is devoid entirely of allegations that could support a finding that Pump Lab had the requisite minimum contacts with Kansas that would allow the Court to exercise personal jurisdiction over Pump Lab in the present case. As such, the case must be dismissed.

III.      An Exercise of Jurisdiction Over Defendants Would Not Be Reasonable.

Although the Court need go no further, Plaintiffs' claims also fail the second prong of the due process test inasmuch as an exercise of personal jurisdiction over Pump Lab would not be reasonable. *TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.,* 488 F.3d 1282, 1292 (10th Cir. 2007)("Even when a defendant has purposefully established minimum contacts with a forum state, "minimum requirements inherent in the concept of fair play and substantial justice may defeat the reasonableness of jurisdiction."). In conducting this analysis, the Tenth Circuit has articulated five factors to be considered in making this determination: "(1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental social policies." *Pro Axess, Inc. v. Orlux Distribution, Inc.,* 428 F.3d 1270, 1279–80 (10th Cir. 2005).

"The analyses of minimum contacts and reasonableness are complementary, such that the reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts]." *Id.* at 1280 (parentheticals in original).

19

1.   The Burden on the Defendant

"The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 114 (1987); *see also Benton v. Cameco Corp.,* 375 F.3d 1070, 1079 (10th Cir. 2004)("The burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction. . . . When the defendant is from another country, this concern is heightened and 'great care and reserve should be exercised' before personal jurisdiction is exercised over the defendant")(citations omitted); *Tomelleri v. Quick Draw, Inc.,* 2017 U.S. Dist. LEXIS 26518, at *8 (D. Kan. Feb. 8, 2017)("When the defendant is from another country, the court must be particularly cognizant of whether the burden of appearing in a distant forum is onerous, and 'great care and reserve should be exercised' before personal jurisdiction is exercised over the defendant.")

"While not dispositive, the burden on the defendant of litigating the case in a foreign forum is of primary concern in determining the reasonableness of personal jurisdiction. **…** This factor is of special significance, because it serves to prevent the filing of vexatious claims in a distant forum where the burden of appearing is onerous." *OMI Holdings v. Royal Ins. Co. of Can.,* 149 F.3d 1086, 1096 (10th Cir. 1998).

Here, Pump Lab – a Spanish corporation headquartered in Spain – has no offices or property in Kansas, no employees in Kansas, and no license to conduct business in Kansas. Pump Lab has no employees who travel to Kansas for any business purposes and, as such, litigating in Kansas would be a considerable burden.  Accordingly. this first factor – the factor that the Tenth Circuit has called the most primary concern – weighs heavily in favor of Pump Lab.

20

2.  The Forum State's Interest in Resolving the Dispute

There is no question, of course, but that "states have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *Id*. at 1096. This is mitigated somewhat, however, by the fact that users of the Superporn Website agree to the Website's Terms of Service, which include submitting to personal jurisdiction in Spain. In such circumstances, this factor does not weigh heavily in Plaintiff's favor. *See, e.g., TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd*., 488 F.3d 1282, 1293 (10th Cir. 2007)("In the present case, the policies explicitly state that the law governing the contract is the law of the Netherlands. Dutch law will therefore govern the subject of the dispute--the interpretation of the insurance policies. Hence, Kansas's interest in providing a forum is offset by the fact that Dutch law will govern the dispute. This factor does not therefore weigh in favor of either party.")

3.  Plaintiff's interest in receiving convenient and effective relief

"The third step in our reasonableness inquiry hinges on whether the Plaintiff may receive convenient and effective relief in another forum." *OMI Holdings*, 149 F.3d at 1097. This inquiry often revolves around the question of whether the other available forum demonstrates hostility towards the type of claims raised by the Plaintiff. As one Age Verification industry association notes, far from being hostile towards age verification claims, "Spain's online safety framework is built on EU law, national audiovisual and child-protection legislation, and an increasingly active policy agenda focused on age assurance and youth wellbeing online. Spain has positioned itself as one of the more interventionist Member States on age checks, particularly for pornography and social media." *See* The Age Verification Provider's Association website: https://avpassociation.com/spain/, last accessed February 9, 2026. To the extent that Plaintiff has

legitimate claims to pursue, he may pursue such claims in the Courts of Spain, as contemplated by the Website's Terms of Service. As such, this factor favors neither party.

4. Interstate judicial system's interest in obtaining the most efficient resolution of controversies

"The fourth factor in our reasonableness inquiry examines whether the forum state is the most efficient place to litigate the dispute. Key to this inquiry are the location of witnesses… where the wrong underlying the lawsuit occurred…what forum's substantive law governs the case… and whether jurisdiction is necessary to prevent piecemeal litigation." *OMI Holdings*, 149 F.3d at 1097 (citations omitted). In the present case, other than the Plaintiff himself, every witness and piece of evidence will be located in Spain. Any decision or action that Pump Lab took (or failed to take) occurred in Spain. And, although it may ultimately be a disputed issue, it is likely that the law of Spain applies to any claims Plaintiff may have. This factor weighs in favor of Pump Lab.

5. Shared interest of the several states in furthering fundamental social policies

"The fifth factor of the reasonableness inquiry 'focuses on whether the exercise of personal jurisdiction by [the forum state] affects the substantive social policy interests of other states or foreign nations.' … '[T]he Supreme Court has cautioned that 'great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.' …Relevant considerations include 'whether one of the parties is a citizen of the foreign nation, whether the foreign nation's law governs the dispute, and whether the foreign nation's citizen chose to conduct business with a forum resident.'" *TH Agric. & Nutrition, LLC*, 488 F.3d at 1297. Here, an exercise of personal jurisdiction over Spanish companies that operate a website from Spain would severely implicate Spanish sovereignty. If a court in Kansas can exercise jurisdiction over Spanish companies simply because they operate a website accessible in Kansas, then the same must hold true not only for every other state in the United States, but for every country and locality

22

around the world, each equally entitled to dictate how Spanish companies conduct their business. This is, obviously, untenable. Additionally, it was not Pump Lab that "chose to conduct business with a forum resident." To the contrary, QR chose to interact with the Superporn Website (and, apparently, a number of other foreign-run websites). His unilateral actions should not be permitted to interfere with the sovereignty of a foreign nation and its corporate entities. This factor, then, weighs strongly in favor of Pump Lab.

Ultimately, an exercise of personal jurisdiction over Pump Lab would not be reasonable and, as such, the Court cannot exercise personal jurisdiction over Pump Lab consistent with the due process requirements of the Constitution, and the present case must be dismissed.

## CONCLUSION

For the reasons stated hereinabove, Plaintiff's complaint must be dismissed for a lack of personal jurisdiction.

Respectfully submitted,
*Attorneys for Pump Lab, SL*


CIAMPA FRAY-WITZER, LLP
s/ Evan Fray-Witzer (pro hac vice)
101 Federal St., Suite 1900
Boston, MA 02110
(617) 426-0000
(617) 507-8043 fax
Evan@CFWLegal.com

BOSTON LAW GROUP, PC
s/ Val Gurvits (pro hac vice)
s/ Frank Scardino (pro hac vice)
825 Beacon Street, Suite 20
Newton Center, MA 02459 USA
 (617) 928-1805
(617) 928-1802 fax
frank@bostonlawgroup.com
vgurvits@bostonlawgroup.com

JOSEPH, HOLLANDER & CRAFT LLC
s/ Christopher M. Joseph, #19778
s/ Carrie E. Parker, #24988
Joseph, Hollander & Craft LLC
1508 SW Topeka Blvd.
Topeka, KS 66612-1887
(785) 234-3272 Main
(785) 234-3610 Fax
cjoseph@josephhollander.com
cparker@josephhollander.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

<u>s/ Christopher M. Joseph</u>
Christopher M. Joseph